UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| CHERYL HARRIS, | : | Case No. 3:17-cv-00317 |
| | : | |
| Plaintiff, | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| vs. | : | |
| | : | |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| | : | |
| | : | |
| Defendant. | : | |

**DECISION AND ORDER**

**I.   Introduction**

Plaintiff Cheryl Harris seeks judicial review of the Commissioner's final administrative determination denying her application for Supplemental Security Income. She has filed applications twice. The Social Security Administration granted her first one, and she received benefits from at least the mid-1990s through 2009. (Doc. #8, *PageID* #1025). Her benefits stopped—not because her health improved but—because she was sent to prison. *See* 42 U.S.C. § 1382(e)(1)(A) (no person is eligible for Supplemental Security Income during months he or she "is an inmate of a public institution.").

Plaintiff was released from prison in 2014. She protectively filed her second application for Supplemental Security Income on February 6, 2014, asserting she had been under a disability since 1995.[1] *See* 42 U.S.C. § 1383(j)(1). Administrative Law Judge (ALJ) Mark Hockensmith found that she was not disabled and consequently denied her second application for Supplemental Security

---

[1]The protective-filing date is when Plaintiff first contacted the Administration to inquire about benefits. It may be used to establish an earlier application date than the date the Administration actually received her signed application. *See* http://www.ssa.gov/glossary.

Income.

Plaintiff finds many flaws in ALJ Hockensmith's decision. She argues, in part, that he failed to reasonably account for the Administration's previous award of disability benefits to her. She also contends that the ALJ failed to adequately weigh the opinions of her treating physicians. She seeks an Order remanding this case for an immediate award of benefits rather than for further proceedings.

The Commissioner finds no error in the ALJ's decision and argues that substantial evidence supports the ALJ's findings. The Commissioner seeks an Order affirming the denial of Plaintiff's second application for Supplemental Security Income.

## II. "Disability" Defined

Plaintiff's eligibility to receive Supplemental Security Income centered on whether she was under a "disability" as defined by social security law. *See* 42 U.S.C. § 1381a; *see also Bowen v. City of New York*, 476 U.S. 467, 470 (1986). Narrowed to its statutory definition, a person is under a disability when her long-lasting (at least one year) "medically determinable physical or mental impairment" prevents her from engaging in "any substantial gainful activity." 42 U.S.C. § 1382c(a)(3)(A); *see Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 602 (6th Cir. 2009).

## III. Background

### A. <u>Plaintiff and Her Testimony</u>

Plaintiff was a "younger" person (forty-eight years old) when she filed her second application for Supplemental Security Income. When she turned age fifty, she aged into the Administration's category of a person "closely approaching advanced age." 20 C.F.R. § 416.963(d). She holds a high-school GED but has no significant work experience, at least since

1999. (Doc. #6, *PageID* #s 77, 224, 239).

Plaintiff testified during her administrative hearing that upon her release from prison, she underwent a psychiatric evaluation and ultimately began treatment with psychiatrist Ritesh Kool, MD and in a program known as the Consumer Advocacy Model. Plaintiff told the ALJ that she began mental-health treatment because she had been "a little unstable all her life…, so she knows she needs treatment in order to function properly." *Id*. at 78. She participated in weekly group therapy in a woman's group because she "had a lot of sexual abuse as a child…, and it was like a processing group." *Id*. at 79.

Plaintiff informed the ALJ that she began treatment with the Cornerstone Project in June 2015. *Id*. at 80. Later, in December 2015, she began twice weekly treatment in the MAT (Medication Assisted Treatment) Program.[2] *Id*. When asked what this involved, she said, "That is a lot of drug and alcohol stuff." *Id*. She was also having one-on-one counseling during which they talk about her personal issues that could have caused her drug and alcohol use. *Id*.

The mental-health treatment she received after leaving prison made her feel less angry, but she still had a lot of problems with depression. *Id*. at 81. She has times when she just wants to "sleep and sleep and sleep for days on end." *Id*. In the past, she used drugs to help bring herself out of depression. She told the ALJ that she was fighting against "the using of drugs—illegal drugs." *Id*. She will go through this fight against illegal drug use and depression two or three times a month, but sometimes an episode will last two weeks. She noted, "I don't even want to get up and eat, shower, or anything." *Id*.

---

[2]The transcript from Plaintiff's administrative hearing refers to the "map program." *Id*. at 80. This is most likely a transcription error. Plaintiff testified about the MAT program at Samaritan Behavioral Health, which uses Suboxone and other medications, along with individual, group, and family counseling, as part of a treatment program for opioid addiction. *See* Doc. #6, *PageID* #881; *see also* https://sbhihelp.org/substance-abuse-services.

Plaintiff she lived by herself in an apartment. *Id.* at 71. She testified that she does not really have friends and does not want to be around other people. *Id*. at 90. She explained:

> It makes me uncomfortable. I mean, I don't trust people…, I feel like people … always have an ulterior motive, you know what I mean? Like they're there because they're going to try and get—rob me or steal something, take my Suboxone, something, there's always something ….

*Id*. at 90. Plaintiff also has problems with concentration. She has trouble reading and remembering what she's read. She explained, "Sometimes I can be talking to somebody and I don't even know what they're saying, I'll be looking at them, I don't even know, I don't even hear them." *Id*. at 91.

Plaintiff's physical health problems include obesity—she is 5'9" inches tall and weighs 250 pounds. *Id.* at 71. She easily gets short of breath and uses a rescue inhaler a couple of times each day, especially when she walks. *Id.* at 84-85. She typically walks a block and a half. *Id.* at 85.

Plaintiff has arthritic pain and bone spurs in her neck and low back. She explained that she has "congenital fusion of some vertebrae…" in her lower back and in her neck. *Id*. at 89. This has caused her to have arthritis throughout her spine. Her pain is always present, and she treats it with "a lot of ibuprofen." *Id.* at 85. At one point, Plaintiff fractured her pelvis. *Id*. at 87. A physician prescribed a cane for her, and she has used it since the fracture. She still has pelvic pain that extends into her upper and lower extremities. *Id.* at 88-89. Plaintiff testified that her lower back pain makes it difficult for her to complete household chores without resting. *Id.* at 91.

**B.      Medical Records and Opinions**

### *Dr. Kool and Ms. Jones*

After her release from prison, Plaintiff underwent an initial psychiatric evaluation with Dr. Kool in May 2014. He diagnosed her with post-traumatic stress disorder, chronic; tobacco dependence; and major depressive disorder, chronic, mild to moderate. *Id*. at 447. Dr. Kool reported that Plaintiff had a history of repeated childhood sexual abuse and a diagnosis of post-

4

traumatic stress disorder (chronic). *Id*. at 445. She also had a history of attention-deficit hyperactivity disorder and bipolar I disorder. *Id*.

According to Dr. Kool, Plaintiff's inventory of depression was positive for depressed mood, initial insomnia, anhedonia, low-self-esteem, low energy, problems concentrating, increased appetite, and suicidal ideations with attempts. Her symptoms of mania were without insomnia or racing thoughts. Although she would be anxious, she could "complete tasks including cleaning her house." *Id*. Plaintiff also described to Dr. Kool her "impulsive money spending or sexual activity, [and] anger issues …." *Id.*

Dr. Kool's mental-status examination of Plaintiff revealed, among other things, that her mood was euthymic, her affect was mildly labile, and she was cooperative. *Id*. Dr. Kool explained, "Given her childhood abuse history, she displays a personality structure that varies in emotional stability that is consistent with low to moderate functioning given her hospitalizations and legal history…." *Id*.

In June 2014, Dr. Kool completed a mental impairment questionnaire in which he opined that Plaintiff experienced marked restrictions in her abilities to maintain social functioning; to sustain concentration, persistence, or pace; to work in proximity to others without being distracted by them; to respond appropriately to criticism from supervisors; to get along with coworkers; and to complete a normal workday without interruptions from psychologically based symptoms. *Id.* at 408-09. Dr. Kool also opined that Plaintiff was extremely limited in her abilities to understand and remember detailed instructions and to interact with the general public. *Id.* at 408-09. Plaintiff's impairments or treatment would cause her to be absent from work more than three times each month, according to Dr. Kool. *Id.* at 408.

Teresa Jones, MS, PCC, Plaintiff's mental-health counselor, wrote a letter in February 2015

on Plaintiff's behalf for the Housing Choice Voucher Program. Ms. Jones thought that Plaintiff "meets the definition of disability under the American Disability Act, the Fair Housing Act, and the Rehabilitation Act of 1973." *Id.* at 510. Ms. Jones listed Plaintiff's diagnoses as bipolar disorder I, post-traumatic stress disorder, and attention-deficit hyperactivity disorder. *Id*.

Down the road a month, Ms. Jones completed a functional capacity assessment for the Department of Jobs and Family Services. She opined that Plaintiff experiences marked limitations in most areas of her mental-work activities, and she thought that Plaintiff would be unemployable for twelve months or more. *Id.* at 548.

Treatment records in April 2015 identify Plaintiff's diagnoses as "Bipolar I disorder, most recent episode (or current) depressed, severe, specified as with psychotic behavior." *Id*. at 746. She also continued to be diagnosed with PTSD. *Id.* at 746-891. She reported struggles with "depression (isolating, cutting, sadness) and anxiety, seemingly tied to PTSD diagnosis." *Id.* at 758, 811, 822.

In late April or early May 2015, Ms. Jones discussed with Plaintiff "recent incidents that led up to dismissal from [the] Women's Group" *Id*. at 756, 748. On May 12, 2015, Ms. Jones completed a questionnaire in which she listed Plaintiff's diagnoses as bipolar I disorder, post-traumatic stress disorder, and attention-deficit/hyperactivity disorder. *Id*. at 701. Ms. Jones wrote, "Currently, Ms. Harris' impairment is severe, due to isolation, inattention, aggressive demeanor, and mood swings. Ms. Harris has recently reported cutting and suicidal ideation." *Id*. at 702. Ms. Jones believed that Plaintiff's impairment had lasted for at least twelve consecutive months. She opined that Plaintiff has marked or extreme impairment nearly all the major areas of work-related mental functioning. *Id*. at 703-04. She thought that Plaintiff would likely miss work at least three times per month, due to her impairments. *Id.* at 703.

In mid-August 2015, Plaintiff fell when stepping off a bus and fractured her right hip. *Id*. at

858, 902, 912. Hospital records state, "The patient has a history of heroin addiction and at this point, she is going to the clinic and she is being treated for heroin addiction, and she is on buprenorphine to avoid heroin withdrawal…. [S]he is very concerned about getting strong [pain-relief] narcotics as she is trying to come of the heroin." *Id*. at 930.

Plaintiff reported having worse symptoms of depression in September 2015. *Id.* at 819. She believed this was "at least partly to do with not using any substances at this time and [she] has to 'live in the real world.' She states being clean from all substances has made her very depressed and emotional." *Id*. at 822.

Psychiatric progress notes on November 12, 2015 report that Plaintiff had a history of marijuana use and opiate addiction but it was in remission with suboxone. *Id.* at 857. Plaintiff again described her depression as "worse," and she again thought it was at least partly because she was not using any substances and has to live in the real world. *Id*. at 858. "She states being clean from all substances has made her very depressed and emotional." *Id*. Plaintiff told Ms. Jones in November 2015 that her moods had been "fairly under control except for a few periods of hypomanic stuff." *Id*. at 868-69.

In January 2016, Ms. Jones noted that Plaintiff's "mental health progress has been slow yet steady. [Her] depression/anxiety are moderate." *Id*. at 881. Plaintiff said, "I'm doing really well, I feel like this new year is going to be great…." *Id*.

### *Psychologist Giovanni Bonds, PhD*

Dr. Bonds evaluated Plaintiff one time upon referral from Ohio's Division of Disability Determination. *Id.* at 497-504. Plaintiff told Dr. Bonds that she had previously received Social Security due to her mental illness. Plaintiff described "her problems [as] depression, poor memory, ADHD, bipolar disorder, PTSD, hepatitis C, COPD and back pain." *Id.* at 497. Plaintiff said she

7

cannot work because she has a hard time concentrating, remembering, and staying organized. She is afraid of the dark and never sleeps for more than an hour at a time. She has trouble breathing and cannot stand for a long time. She has a hard time walking. She reported mental problems since childhood, including nervousness/anxiety, panic attacks, recurrent and intrusive memories of a traumatic event, sleep disturbance, depressed mood, suicidal thoughts, social withdrawal, hyperactivity, lack of energy, poor memory, and mood swings. *Id.* at 498.

Dr. Bonds observed that Plaintiff's mood seemed moderately depressed, and her affect was broad and appropriate to her thought content. *Id*. at 501. Plaintiff told Dr. Bonds, "I feel down. I don't want to go anywhere. I have always felt inadequate." *Id*. Dr. Bonds found that Plaintiff's "cognitive abilities seem below average and in about the borderline low average range." *Id.* at 502. Dr. Bonds diagnosed Plaintiff with bipolar disorder, opioid dependence, and borderline intellectual functioning. *Id.* at 503. She opined that Plaintiff has low frustration tolerance. She would have some difficulties dealing with the interpersonal stresses of working, dealing with the public, and being around many people. *Id.* at 504.

Dr. Bonds also completed a mental capacities assessment in which she opined that Plaintiff was moderately impaired in most areas of work-related mental functioning, with mild impairment in her ability to make judgments on simple, work-related decisions. She had no impairment in her ability to carry out simple instructions and tasks. *Id.* at 507-09. She had poor stress tolerance and poor coping skills for dealing with work conflicts and pressures for work performance and productivity. *Id*. at 509. Dr. Bonds noted, "Substance abuse has contributed to her problems but even when not using she is very emotionally unstable." *Id*.

### *Deryck Richardson, PhD and Courtney Zeune, PsyD*

In April 2014, psychologist Dr. Richardson reviewed the administrative record. *Id.* at 104-

8

15. He opined that Plaintiff had mild restrictions in her activities of daily living, moderate difficulties in social functioning, and moderate limitations in concentration, persistence and pace. *Id*. at 110. He found insufficient evidence in the record to conclude that Plaintiff had episodes of decompensation of extended duration. *Id*. Dr. Richardson thought that Plaintiff should avoid rapid-pace work, high-production standards, frequent changes, and anything more than superficial contacts with others. *Id.* at 113-15.

In September 2014, psychologist Dr. Zeune reviewed the administrative record. She opined that Plaintiff should avoid strict production quotas and should work in a setting with minimal social distractions. *Id.* at 131. According to Dr. Zeune, Plaintiff would be restricted to a job where she could work independently or with one or two familiar coworkers for superficial interactions in a non-public setting where there is no over the shoulder scrutiny. *Id.* at 132.

### *Scott D. Shaw, M.D.*

In October 2014, Plaintiff began primary-care treatment with Dr. Shaw. *Id.* at 555-58. She continued to see Dr. Shaw for treatment until at least June 2015. *Id.* at 560, 563, 566, 569, 573, 710.

On March 31, 2015, Dr. Shaw opined that Plaintiff could only stand for one hour per eight-hour workday and she could lift ten pounds at most. *Id.* Dr. Shaw opined that due to low back and neck pain (with bulging discs), Plaintiff had extreme limitations in pushing, pulling, bending, reaching, handling, and performing repetitive foot movements. *Id.* Dr. Shaw concluded that Plaintiff was unemployable for twelve months or more. *Id.* at 579-80.

In April 2015, Dr. Shaw completed a Questionnaire. *Id*. at 699-700. He opined that Plaintiff could frequently lift five pounds but could never bend, stoop, or balance. He thought that Plaintiff could stand for thirty minutes at a time and sit for sixty minutes at a time. He further

9

opined that Plaintiff needed to elevate her legs occasionally during the day. Dr. Shaw concluded that Plaintiff's medical problems would take her off-task twenty percent of a typical work week.

### *Consultative Examiner Damian Danopulos, M.D.*

In April 2014, Plaintiff was examined by Dr. Danopulos at the request of the state agency. *Id.* at 384-98. Plaintiff complained of shortness of breath, headache, neck, mid, low back pain. Dr. Danopulos noted that since birth, Plaintiff has had effort-related shortness of breath. Plaintiff reported that she can walk one block but had to stop after climbing half a flight of stairs. *Id.* at 384. She noted her headaches are constant. *Id.* at 385. On examination, she weighed 261 pounds. She exhibited a normal gait and bilateral leg-raising tests were normal. Cervical range of motion was normal but painful. Deep tendon reflexes were highly exaggerated in upper her extremities. She exhibited full strength in all areas. Her grip and fine manipulation were normal. Lumbar range of motion was 80 degrees flexion, 20 degrees extension. All other range of motion was normal. *Id.* at 386-87, 390-93.

Lung examination showed wheezing to auscultation. Her "chest excursions were normal but expiration was prolonged. No labored breathing existed. She showed no cyanosis." *Id*. at 387. Dr. Danopulos noted, "Ventilatory function study revealed moderate degree lung obstructive disease." *Id*.

Dr. Danopulos concluded that Plaintiff has no physical impairments that would interfere with work related activities. *Id.* at 389.

### *Record Reviewers Steve E. McKee, MD and Esberdado Villanueva, MD*

In May 2014, Dr. McKee reviewed the administrative record. *Id.* at 104-13. He opined that Plaintiff could occasionally lift and/or carry fifty pounds and frequently lift and/or carry twenty-five pounds. She could stand and/or walk for six hours out of eight and sit for six hours out of eight. *Id.*

at 112. He believed that Plaintiff could frequently climb ramps/stamps and occasionally climb ladders/ropes/scaffolds. Dr. McKee thought Plaintiff should avoid concentrated exposure to extreme cold, hot, humidity, fumes, odors, dusts, gases, poor ventilations due to her COPD. *Id*. at 113.

Several months later, Dr. Villanueva reviewed the administrative record and concurred with these aspects of Dr. Smith's opinions. *Id.* at 128-30.

**IV.     Standard of Review and ALJ Hockensmith's Decision**

Review of ALJ Hockensmith decision considers whether he applied the correct legal standards and whether substantial evidence supports his findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance...." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

ALJ Hockensmith considered the evidence and evaluated Plaintiff's disability status under each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 416.920. His more pertinent findings began at step two where he found that Plaintiff had many severe impairments including, for example: scoliosis with lumbar degenerative disc disease; status post right-hip fracture; chronic obstructive pulmonary disease; obesity; bipolar disorder; post-traumatic stress disorder; attention-deficit hyperactivity disorder; and opioid dependence. (Doc. #6 at *PageID* #42).

He determined at step three that Plaintiff was not automatically eligible for benefits under the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step four, the ALJ examined the most Plaintiff could do despite her impairments—her residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir.

11

2002)—and concluded that she could perform light exertional work subject to 16 limitations:

> (1) no ladders, ropes, or scaffolds; (2) occasional ramps/stairs; (3) frequent balancing; (4) occasional stooping, kneeling, crouching, and crawling; (5) frequent overhead reaching bilaterally; (6) avoid concentrated exposure to extreme heat and cold and humidity; (7) avoid concentrated exposure to fumes, dusts, gases, odors, and poorly ventilated areas; (8) no work at unprotected heights; (9) occasional pushing/pulling with upper and lower extremities; (10) limited to simple, routine tasks; (11) in a static work environment with few changes in routine; (12) no fast paced work or strict production quotas; (13) no contact with public; (14) minimal social distractions; (15) occasional contact with coworkers and supervisors; and (16) no tandem or collaborative work.

*Id.* at 45.

The ALJ found at step five that an individual with Plaintiff's residual functional capacity, age, education, and work experience can perform many jobs (about 2.2 million) that exist in the regional economy. *Id*. at 56. Given this finding, the ALJ ultimately concluded that Plaintiff was not under a benefits-qualifying. *Id*.

## V.     Discussion

Plaintiff argues that ALJ Hockensmith erred in failing to secure, and then consider, her previous administrative record and the evidence that resulted in her award of disability benefits from the mid-1990's to 2009. Plaintiff contends that "principals of *res judicata* bind the Commissioner to prior administrative findings which were favorable to a disability claimant. *See* AR 98-4(6)." (Doc. #8, *PageID* #1033). This contention lacks merit. The Regulations and *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018) tell why.

As noted above, Plaintiff was on SSI for nearly fifteen years until she was incarcerated in 2009. While incarcerated her benefits ceased. When she was released she filed again for benefits. (Doc. #6, *PageID* #s 196-203).

The Regulations establish a suspension first, termination later procedure for individuals incarcerated in public institutions. When an SSI recipient is initially incarcerated, payment of his or

12

her SSI is *suspended*. *See* 20 C.F.R. § 416.1325(a). Yet SSI eligibility is not suspended forever. "If benefits are otherwise payable, they will be resumed effective with the earliest day of the month in which a recipient is no longer a resident of a public institution…." *Id*. § 416.1325(b). If the Regulations stopped here, Plaintiff's benefits would have automatically resumed after her release from prison (assuming she still met the other eligibility requirements). *See id*.

But the Regulations don't stop here. They also provide, "We [the Administration] will terminate your eligibility for benefits following 12 consecutive months of suspension for any reason …." *Id*. at § 416.1335. The ALJ reported that Plaintiff was incarcerated "beginning in December 2010 through February 2014…." (Doc. #6, *PageID* #49). She thus served well over 12 consecutive months in prison. Consequently, her eligibility for SSI benefits terminated at the start of her 13th month in prison with no possibility her eligibility would automatically resume upon her release from prison. *Compare* 20 C.F.R. § 416.1325(b) *with* § 416.1335. The Commissioner is therefore correct to point out that once Plaintiff's eligibility for SSI terminated during her incarceration, she needed to file a new SSI application upon her release from prison. *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008). This, however, is not the panacea the Commissioner hopes for.

"'Res judicata bars attempts to relitigate the same claim, but a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.'" *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933 (6th Cir. 2018) (quoting *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998)). Both the Commissioner and the applicant for benefits are entitled to seek a "fresh review of a new application for a new period of time." *Earley*, 893 F.3d at 934. When engaging in a fresh review, "it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are a legitimate, albeit not binding, consideration in reviewing a second application." *Earley*, 893 F.3d at 933.

ALJ Hockensmith's decision does not mention many pertinent facts, including (1) Plaintiff's previous, pre-incarceration disability status and resulting SSI award; (2) the Administration's previous determination that Plaintiff was under a disability starting on November 1, 1995 due to a personality disorder and anxiety; (3) the Administration's reconsideration on two occasions and finding on each occasion that Plaintiff remained eligible for SSI disability benefits; (4) Plaintiff remained eligible for SSI disability from the mid-1990s to 2009; and (5) the records from Plaintiff's previous award and continuation of benefits were missing. The ALJ's decision, moreover, does not cite to or refer to the evidence that establishes these historical facts. In 2014, a Quality Assurance Specialist for the Administration wrote:

> Claimant is a 48 y/o female with a history of prior allowance on 2/6/96 with EOD [Established Onset Date] of 11/1/95 as a med-voc allowance for Personality d/o, Anxiety. She was continued on review 8/26/66 [sic] and 11/18/03. Benefits were suspended on 9/30/09, then 8/13/2010 and 12/03/2010 when clt went to Butler County Jail. Prior folder could not be located.

*Id*. at 239.

It was error for the ALJ to ignore such evidence of record because "fresh review is not blind review…," *Earley*, 893 F.3d at 934, and "the findings of a previous ALJ remain relevant to a subsequent disability application." *Cowens v. Commissioner of Social Security*, 2019 WL 3947590, at *10 (S.D. Ohio 2019) (citing *Earley,* 893 F.3d at 934) (Litkovitz, M.J.), *Report and Recommendation adopted*, 2019 WL 3944433, at *1 (S.D. Ohio 2019) (Black, D.J.)). The principles advanced by res judicata support this:

> What are those principles? Finality, efficiency, and the consistent treatment of like cases. An administrative law judge honors those principles by considering what an earlier judge found with respect to a later application and by considering that earlier record.

*Earley*, 893 F.3d at 933 (citing *Drummond*, 126 F.3d at 842; *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 478 (4th Cir. 1999)). ALJ Hockensmith did not honor these principals. He instead paid

14

no heed to them by failing to consider any of the five historical facts (listed above) arising from Plaintiff's pre-incarceration, long-term disability status.

The Commissioner points out that Plaintiff's previous administrative file could not be located, leaving it unknown whether Plaintiff's previous SSI application "was adjudicated by an ALJ or the Appeals Council or the specific reasons for Plaintiff's entitlement to benefits." (Doc. #13, *PageID* #1057). The Commissioner's latter point is incorrect. Plaintiff was previously found disabled starting on November 5, 2006 due to her personality disorder and anxiety. *See* Doc. #6, *PageID* #239. These and other mental-health problems continued to be disabling for Plaintiff for about 14 years. *See id*. Although more would be known if the previous record had been located, enough was known at the time of ALJ Hockensmith's decision to connect her second application with her previous disability status.

The Commissioner's former point does not get far either. There is no meaningful difference between the disability finding by a previous ALJ's or the Appeals Council's decision concerning a past adjudicated time period. Both findings follow, and are based on, a trial-type hearing held by an ALJ. *See Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 841 (6th Cir. 1997) (ALJ's hearing approximates a judicial trial by resolving whether claimant is eligible for social security benefits.). Even if a significant difference existed, much remains presently unknown without the previous administrative record. This is problematic for the Commissioner in the circumstances of the present case because the previous administrative record was doubtlessly in the Administration's custody at some point and because the present record merely contains a cryptic note stating, "Prior folder could not be located." (Doc. #6, *PageID* #239). The present administrative record contains no hint about what the Administration did to search for the previous record, whether any meaningful search was done, or why those records could not be located.

15

The present case, moreover, involves a "black swan—the unusual situation in which the individual wanted the administrative law judge to make the same finding on one issue that he had made in a prior ruling. Most applicants reapply only because the Administration found them not to be disabled." *Earley*, 893 F.3d at 934. In this black-swan situation, it is fair to place the burden on the Administration to produce the previous administrative record or, at a minimum, to document its reasonably thorough search for it—after all, the Administration benefits from the absence of the previous records, and it is not Plaintiff's fault that the records are missing. And placing the burden on the Commissioner in this situation advances the res-judicata principles—again, "[f]inality, efficiency, and consistency of treatment of like cases." *Id*. at 933; *cf. Drummond*, 126 F.3d at 843 (black-swan case placing the "burden … on the Commissioner to prove changed circumstances and therefore escape the *principles* of res judicata." (italics added)).

The ALJ's error in turning a blind eye to the Administration's previous disability determination was not harmless due to the substance of the information he overlooked, particularly that the Administration had previously found Plaintiff disabled and eligible for benefits for approximately 14 years due to her personality disorder and anxiety. In addition, the reason Plaintiff's eligibility for benefits ended was her incarceration, not a determination that her health had improved to the point she was no longer under a disability. And it is counterintuitive to think that Plaintiff's four to five years in prison improved her mental health such that she could engage in full-time work, even when she had never been able to do so for a sustained period of time before her incarceration. This information was relevant to whether Plaintiff was under a disability after her release from incarceration, and the ALJ's failure to consider it was prejudicial to her.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[3]

---

[3] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of

A remand for further consideration is warranted for the Administration (1) to conduct a reasonable search for Plaintiff's previous administrative, (2) to either add the previous administrative record to the present administrative record or certify that the previous administrative record is lost and not capable of reconstruction; (3) to consider, in the first instance, Plaintiff's previous, long-term disability status and related evidence as part of a fresh review of whether she was under a disability starting on February 6, 2014.

## IT IS THEREFORE ORDERED THAT:

1. The Commissioner's non-disability finding is vacated;

2. No finding is made as to whether Plaintiff Cheryl Harris was under a "disability" within the meaning of the Social Security Act;

3. This matter is REMANDED to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4. The case is terminated on the Court's docket.

January 10, 2020                          *s/Sharon L. Ovington*
                                                                            Sharon L. Ovington
                                                                            United States Magistrate Judge

---

Plaintiff's other challenges to the ALJ's decision is unwarranted.